Our third case this morning is case number 415006 for Enright, E.C. and Minor, Rebecca Rogers v. Chapman for the appellant, Bryce Lynch for the appellee, Phillip Lampkin, Mr. Lynch. Morning, your honors. May it please the court, counsel. My name is Bryce Lynch. I represent the respondent in this case, Matthew Chapman, who is the father of the minor child. Your honors, we are appealing the decision of the circuit court, Judge Fenson, and we are appealing based on the fact that the manifest weight of the evidence is applied to the section 602 factors for custody. The decision of the court was against the manifest weight of the evidence. I think of manifest weight of the evidence as a scale, and the scale in this case, when you actually look at the record, read the facts of this case, tips farther in the balance, much farther in the balance of Mr. Chapman than it does for Ms. Rogers. The facts in this case, there was significant... That's not really the question, though. Is it under a manifest weight standard? The manifest weight of the evidence, you look at what overwhelmingly is the evidence that supports custody with... The opposite conclusion has to be clearly pinned, correct? Correct. And that's what you're arguing? I am, and if you look at the record, if you look at all of the facts, the opposite conclusion is clearly evident from looking at all of the facts as applied to the best interest factors. There was significant violence by the mother, and the evidence of facts of violence was cited in Judge Fenton's ruling on November 25, 2014. He indicated that it looked like the mom had been guilty of violence when she grabbed for the carrier to try and grab the child away from Mr. Chapman. Mother also was throwing various articles, she was throwing an article of clothing on a visitation exchange on July 21, 2014. Significant amount of vulgarities on that July 21, 2014 instance. And right during the breakup, and maybe possibly sometime prior to the breakup, she throws a phone and smashes Matthew Chapman's phone. The court can look at the violence of the petitioner, Rebecca Rogers, and see that that is not a factor, those two factors as they apply in Section 602. They do not favor her, and I think that the trial court acknowledged that in its ruling. You also see that there was an inability for the petitioner to foster a close relationship, and there are myriad examples in the record of how she's not able to do that. Right away she threatened supervised visits after the breakup in April of 2014. When the parties went to have her remove her possessions and some of the possessions from the house that Mr. Chapman was staying at with Ms. Rogers and he owns, she left him with only a few daddy clothes and the pack and play. She would not share what the contents were in a letter from the child's pediatrician. Easter Sunday they had an agreement for Mr. Chapman and the minor child to have some time together, and instead she scheduled pictures that apparently didn't take place, or she didn't share the pictures with Mr. Chapman. She wouldn't share the information on who was to watch the minor child when she was unavailable, and wouldn't allow Mr. Chapman to have the right of first refusal when she needed to work and Mr. Chapman was available to watch the minor child. Memorial Day, Mr. Chapman asked for the minor child until Memorial Day, he's off work. She requires him to only have the child until 1 p.m. on Sunday, arbitrarily and unreasonably. She threatens to terminate visits, she threatens to, after the May incident of violence. Father's Day, if you look at the Father's Day text, despicable Father's Day text saying, I'm not going to allow you to have the child on Father's Day, ha ha ha, enjoy your Father's Day alone. It was unacceptable behavior on her part, and she shows an inability to foster a close and continuing relationship. And I think that the petitioner is going to argue that those instances took place so far back in time that the trial court gave it little weight, but there was not just examples of bad behavior early on. I mean, the July 21st instance took place about four months prior to trial when she was showing up to the house, cussing at Mr. Chapman, throwing the article of clothing on the ground. That took place July 21st, and another example even closer to the trial date on November 24th and 25th is when Mr. Chapman texts, hey it's Halloween, it's the child's first Halloween, could you please bring her by so I can see her and my family can see her on her first Halloween? We want to see what she looks like in her outfit. And no response. She wouldn't even send a picture of what the child looked like on her first Halloween. So the petitioner made a case at trial that the evidence supports that she's a changed person now, that she's a different person than what you saw back in May when she was interfering with the father's visitation time, with June when she was interfering with Father's Day, with July when she was showing up at his house cussing in front of the minor child. Now granted, the minor child is less than a year old at this time, she probably can't understand all these cuss words, but that doesn't change the facts that her inappropriate behavior proves that she's unable to foster a close relationship. We see multiple examples of the father's ability to foster a close and continuing relationship. His text saying that, hey the child needs both of us, not just one of us, early on after the parties broke up. He offered right away to switch his parenting time with the mom when she was going to have a shower for her sister's baby. He offered to switch Mother's Day without prompting, allowed the mother to have the birthday, offered to switch times on Mother's Birthday, but she refused to switch times, didn't get made up. He provided her with a Mother's Day card from the child, provided her with flowers on her birthday from the child, and the evidence supports that father has the ability to do that going forward. The only evidence, and it seems that the court relied on the guardian ad litem's improper testimony, which was objected to at trial regarding compromise settlement negotiations. The guardian ad litem testified to not just conduct, but he also testified to statements that I believe improperly influenced the trial court. And that's why I don't believe that the trial court, in custody cases the trial court obviously gets great deference and they obviously are in a position to evaluate the credibility of the witnesses. But by allowing in testimony of my client's conduct in settlement negotiations between the guardian ad litem and the respondent and the petitioner, the guardian ad litem basically said that my client had a chip on his shoulder, he came in with anger, and none of that is admissible pursuant to Illinois Rule of Evidence 408. Did the trial court cite any of that for a reason for its ultimate conclusion that it reached? No, it did not. It did not cite in its ruling that it relied on the evidence of what was taking place during that compromise negotiation. But, I mean, if you look at the manifest weight of the evidence, all of the facts, and you look at the trial court's ruling on the ability to foster a close and continuing relationship, the court did not find that that was favorable to either party. And when you look at all of the evidence that was presented, I don't see how you can reach that conclusion unless you are improperly influenced by that inadmissible evidence. Well, the trial court indicated that it was only going to receive the testimony relating to the mediation as it related to the demeanor of the parties. Is that right? Well, first off, the trial court stated that I believe that the conduct of the parties is admissible. The trial court later on at the hearing on the motion to reconsider kind of backpedaled a bit and said, no, I think that this is demeanor, and so I allowed access of the demeanor. None of it should be admissible. I mean, to allow anything to come in from compromise negotiations would be violating public policy and would have a chilling effect upon people in custody cases entering into compromise negotiations, especially with the guardian ad litem present. And one of the roles of the guardian ad litem is to see if there can be a settlement between the parties, to try and make efforts to see if there's an ability to resolve this without the need for a contested hearing. To allow anyone to testify, especially the guardian ad litem or the parties, to testify as to what took place in compromise negotiations, that will have a chilling effect on any attorney advising their client, hey, don't go into... Do you have any case law that supports that proposition? I do not. I do not have any case law where a guardian ad litem stated that this is what happened during the settlement negotiation. I wasn't able to find anything in Illinois, and what I do find is... Counselors, as you know, counsel, are unique, and perhaps your application of the evidentiary rule doesn't apply to this type of case. Well, I would disagree with that. Because you have these evidentiary rules for civil proceedings. A marriage case is a civil proceeding, and you follow the rules of evidence in civil proceedings that are subject to this Rule 408. And you can allow a guardian ad litem to hear instances of inadmissible evidence. That does happen. In the Koronis case, which is a First District case, and I'm sure you've heard of it before, that First District case in Koronis, the guardian ad litem heard an inadmissible tape that was basically an illegal wiretap by one of the parties. I mean, they tape recorded another party, which was in violation of the Illinois Eavesdropping Act at the time. And the guardian ad litem's testimony and opinion wasn't thrown out because he's heard inadmissible evidence. The guardian ad litem's opinion is subject to cross-examination, which is so important to show that the guardian ad litem's opinion is tainted by this inadmissible evidence. Could I interrupt you for a moment? Rule 408 precludes the admission of offers of compromise or settlement. So that's the language within 408, right? Yes. What we're dealing with here, it isn't that there was some offer of compromise or settlement as to a visitation issue or custody issue. It was as to how your client behaved during the course of the mediation. So this Rule 408 is implicated here. Yes, because Section 2 specifically says conduct and statements made during these offers of compromise, offers of saying I'm liable or something to that effect, prohibits conduct and statements. It expressly says that in Section 2. And in this case, didn't we have a situation where there was an indication that your client was not being reasonable and being too demanding during the negotiation, so to speak? Isn't that the position the guardian ad litem took? I would think that the guardian ad litem took more of the position that he came in with a chip on his shoulder. So yes, that he came in unreasonable and ready to go to court almost, led the guardian ad litem to the position that, yeah, he had a chip on his shoulder, and he even quoted my client. I'm recalling something about your client allegedly reacting when she would not agree to what he wanted to agree to. Yes. See Dick, she doesn't want me to see my child. So you've got the, it's an interesting legal issue because you have the statute that basically calls for a guardian ad litem to either testify or prepare a report setting forth his or her recommendations to the court. Then you have the Supreme Court rule, 907, that says a guardian ad litem shall determine whether a settlement or the custody dispute can be achieved by agreement, and to the extent feasible, shall attempt to resolve such disputes by an agreement that serves the best interest of the child. So on the one hand, you've got the statute that requires that the guardian ad litem testify or provide a report containing recommendations to the court. And then you have a Supreme Court rule saying that the guardian ad litem shall basically attempt to conduct mediations of custody disputes. And here what you're saying is, but the guardian ad litem cannot testify regarding aspects of the mediation. Yes. And in response to Justice Turner's question, there is no case that indicates that, that supports that position. Not that I could find in Illinois. I wasn't able to do much research outside of the state of Illinois. My research capabilities are limited to the state of Illinois besides FAST case, and that didn't help me too much. There is an ethical rule that prohibits attorneys acting in the capacity of a mediator from sharing confidential information if they have previously served, I think it's if they've previously acted as a mediator and then later represent an individual involved in the proceedings from being able to use information gained from the mediation. Is that right? That's correct, and there was actually a case that dealt with that issue that I cited in my reply brief. Hedford? Yes. In Indicta, the court said that a guardian ad litem should really avoid putting himself in that position of being a mediator and then testifying about what took place and getting involved that way when you have a responsibility to look out for the best interest of the child. So the guardian ad litem put himself into a bad position by agreeing to try and mediate between these two parties. Was the mistake agreeing to mediate or was the mistake, as you assert here, getting into it as far as what happened at the mediation? I think that as a guardian ad litem you have to try and see if there's some avenue for resolution between the parties rather than put them into a contested hearing where contested hearings probably aren't in the best interest of the child. It is much better for the parties to resolve these matters rather than go to a two-day contested hearing where you're bringing out all these facts of how both sides behave badly or how both sides are not necessarily the best person. It's hard to get over something like that. So the guardian ad litem still needs to try and resolve matters pursuant to Rule 907. That's their job. But when you report back to the court as to what took place in those negotiations, that's when you cross the line as a guardian ad litem. He was also asked questions upon direct examination by the petitioner's attorney, wasn't he, about what occurred? Let's just take the circumstance where it's not the guardian ad litem volunteering what occurred during mediation, but in fact does not disclose any of that and instead is asked direct questions by a party's attorney. So the guardian ad litem is in a trick box there really, isn't it? At that point the other attorney should object and the guardian ad litem should object to making any kind of testimony regarding that. I see that I'm close to out of time at this point. I would like to ask you a question. You talked about the fact that the judge seemed to believe that she had changed her ways and would, going forward, be able to facilitate a relationship. So that's a credibility decision. Even if the judge decided that, do you still think your client should have prevailed? Yes, because the court's determination on credibility was tainted by this inadmissible evidence. But also the record just does not support that she was credible. If you look at, she had a prior inconsistent statement from the deposition taken in October of 2014. She had, on cross-examination, several instances where, myself, I had to confront her with text messages before she would admit to saying something or doing something. Father's Day is a prime example of that. She was very evasive during cross-examination, less than candid with the court. And to look at the record and determine that she was a credible witness, the record doesn't really support that. Finally, your honors, the visitation award was manifestly unjust, especially when you apply it to the facts and circumstances of this case. If you do not overrule the court's custody determination, then there are special circumstances for this case. To award more than just the minimum standard visitation every other weekend and one night overnight during the week. Dad has had substantial time with this child. He has been a good father to this child. He has done everything that he can to fight for time, and time with dad is in the best interest of this child. It's not selfish love on his part. It's, mom's trying to keep me away from the child, and I know it's in her best interest for us to have a good relationship with each other. Thank you. Thank you, counsel. You will have rebuttal. Mr. Lampkin. Good morning, your honors. Good morning. Please, court and counsel. Your honor, I would disagree with Mr. Lynch simply from the point of view that I feel there was more than sufficient evidence in this matter presented by the petitioner Rebecca Rogers' testimony alone for the court to support its decision. Certainly, there was other testimony out there. I think it's clear that what a counsel categorizes as issues of violence were looked at by the court in that way. One time was a piece of clothing was thrown on the ground, a different time a phone was thrown on the ground. There was no physical contact or physical violence. There was maybe one time where she reached inappropriate for a carrier, but that's not even defined. And so that's what counsel and their arguments resting on is about all this violence. I don't think that existed. Clearly, my client would appear from all the facts to have been more affected by the breakup between the parties than Mr. Chapman was. And during the time soon after the breakup, yes, there was hard feelings, probably still are, but her testimony was quite definite on how she had evolved and understood the need for her daughter to have a relationship with Mr. Chapman as the father, that that was so very important, testified as to the reasons why, basically her own family situation, her own father's and sister's lack of ability to have a relationship early on because of hard feelings, et cetera, and that after talking with them, she'd learned from that. It doesn't necessarily heal every emotional scar, but on the other hand, she became better armed with the, I think, the maturity to get over that in some sense. Well, counsel, what actions were there to support those words? I mean, we have counsel saying as late as Halloween, there's no response to a request, can I at least see my child in the Halloween costume? Well, I think the actions are the lack of real problems. I mean, once there was a visitation order entered on July 1st, the only dispute about visitation after that was basically concerning a potential one hour every two weeks that Mr. Chapman thought he should be able to get because the Saturday visitation had changed. At the time the order was entered, he was getting his child every other Saturday. That never changed. On the two Saturdays where it wasn't his time, he was getting her in the morning because at that point in time my client was working on Saturday mornings. That changed. And then there was, it never quite worked out all the way up to the hearing of getting four hours substituted versus three. And that would appear to have been the only dispute. Everything else went fine after that. And so the response is that it did work out, other than that one little bit of time that wasn't provided for. And again, in that sense, there were negotiations. The other side of that would be the fact of the attempts during the November 12th meeting to try to put an agreement together. I will agree with counsel in the sense that there isn't a lot of case law guidance on the issue of the parameters of the guardian ad litem. The Supreme Court rule clearly indicates that they're supposed to try to reach an agreement. That was done. How much has been talked about? The Supreme Court case, the Wilde case, which I cite in my decision, talks about the need for broad disclosure. Anything that can help the court decide. Certainly the facts of that case are different than the facts of this case, but the words are exactly the same. And the actual terms of the mediation of the settlement was never testified by the guardian ad litem. Frankly, as an attorney for my client, I felt the demeanor of the parties was important. And yes, I questioned the guardian ad litem about that. If that's wrong, then I think that's an issue that needs to be dealt with. And I'd be happy to address it. But as counsel of my client... Did you ask about things other than tone of voice, inflection, body, facial expressions, that sort of thing? Did you ask about statements that were made during the course of the mediation? I frankly don't entirely remember whether I specifically asked. Certainly one of the statements that Mr. Chapman had made expressed the issue of demeanor, which was that he was mad because my client wasn't agreeing to what he wanted. Whether I specifically asked that or Mr. Courts testified about it, there's no question. Whether it was just his response to my more general question, I can't really say at this point. I don't remember. Well, you've read that Petrick case that the opposing counsel cited too? Yes. And the second district in that case indicated, we note that an attorney in O'Connell's position would be wise to be cognizant of conflicts of interest arising out of appointments as mediator and GAL in the same manner. Given a mediator's obligation to keep mediation communications confidential, contrasted with the GAL's duty to testify or submit a written report to the court, an attorney's exposure to confidential information as mediator would undermine his or her ability to subsequently fulfill his or her role as GAL. So the statements, there was at least a statement that was disclosed at the time of the hearing that was made by a respondent during the course of the mediation. And do you believe that the concerns of the second district in Petrick are implicated here or do you disagree with the second district's concern in general? Well, Your Honor, in my limited experience in dealing with that issue, I would indicate that at least common practice in our area, which again, a small little county, things could be very, very different in many other places. But the first level after a case is filed is many times for the court to inquire whether mediation itself, just direct mediation, would be worthwhile. There was an attempt at that. My client basically, and there's some confusion. I don't think that was ever ordered. There was some talk that it would be agreed to. Then at the last minute, my client did not go to the mediation. And so there was nothing done. That was a whole different person. The GAL was appointed. Reports were given. I don't know that I would call it the same aspect of a mediation hearing that what took place in November with the guardian light and president and the parties present. Now, that may simply be how you call a particular color. And it is the same color. I don't know. But on the other hand, it was the guardian at light basically exercising what he felt. And I would feel, if I was in his situation, the duty to try to get the parties to reach an agreement if possible. Do you ever serve as a GAL? No, I do not. Okay. Not in this type of framework. I do all the time, both in juvenile cases and also in disabled adult cases. But those are entirely different frameworks and things like that. I'm not a GAL in family cases. Okay. What about a mediator? Do you serve as a mediator? No, I do not. In this case, you appreciate Mr. Koretz's position where he's serving as both GAL and mediator and that there is the potential that he could run afoul of the rules of professional conduct if he were to share a confidential communication. Well, again, I don't know that anything that was expressed, certainly in court, I wouldn't consider as a confidential communication. This was not sharing somebody's dark secrets or anything like that. So I would, I guess, disagree that anything that was brought before the court by way of Mr. Koretz's testimony should be considered confidential communications. And so I don't feel that he violated any code of professional conduct. Certainly, that's not to say this court couldn't rule that some of his testimony shouldn't have been admitted. But I don't feel it's because of that. Again, this was not somebody who bared their soul in some sense, assuming that it would never be told or reach the light of day. This is entirely different than that. This is more, yeah, Mr. Chapman may not appreciate somebody's opinion about how he was acting, but I don't know that that would be considered confidential communications for purposes of that rule or anything having to do with that rule. I guess that would be my position on that. And it seemed like Judge Finson, at least the implication reading the cold record here, is that he appreciated that there was a distinction to be made between statements that were made during the course of the mediation versus the demeanor. Well, I think that very much was his ruling. To me, that's correct. Again, in some sense, this case may be the case that goes into that, or he may decide, obviously, not to deal with it at all. I do feel there's plenty of evidence in this case, and that's my main point. Regardless of anything Mr. Court said to support the case's conclusion, I don't know that we have to address that issue to decide this case. But, again, in some ways, if I wasn't involved with this case representing my client, having a case come out that kind of dealt with it a little bit would probably be nice. But, again, from my point of view, I'd be happy if you guys just ignored it and ruled that there's plenty of evidence in that regard. Being honest, I guess. I have nothing further unless your honors have any questions. I don't see any. Thank you, counsel. Okay, thank you. Is there any rebuttal? Yes, please. To address Mr. Lampkin, thank you, Mr. Lampkin. The testimony of the petitioner, Mr. Lampkin said, was sufficient evidence of her ability to be the better custodial parent. And really, when I read through the record of her testimony on direct examination, cross-examination, and rebuttal, is lots of acknowledgments and platitudes that I'm a different person now. No facts. No facts to support that I'm a different person now. So, really, there's not a lot in her testimony that supports that she's the better custodial parent under the 602 factors. We have, also in my brief, I've cited two Fifth District cases that I think are factually similar. And when the judge says breaking up is hard to do in his ruling, cites, I can't remember the name. Neil Sadaka. Neil Sadaka. Yes. When he cites Neil Sadaka as breaking up is hard to do. In the two Fifth District cases that I cited for Noach and Mayer and Melton, I believe it was, both of those two women were going through a tough breakup. And one of those women actually indicated, I'm going to counseling for this. That's a lot more in that case of actually doing something about an acrimonious breakup to support that, hey, I can foster a close and continuing relationship. And even in that circumstance, in the Noach and Mayer case, the court said, sorry, that's not good enough. You did not do enough to foster a close and continuing relationship. Breaking up is hard to do is not a good enough excuse. You have a duty to foster a close and continuing relationship with that other parent when you're the custodial parent. And it's an important duty because you are given a big-time responsibility when you have custody of a child. You have an important job to make sure that that child is brought up with not just the influence from you, not just the love and respect from one side of the family, but it takes two to raise a child. And sometimes it even takes more than that. Sometimes it takes a village. It takes the family members of the mother, the family members of the father. Breaking up is hard to do isn't a good enough excuse. Mr. Lampkin also cites that there's a lack of problems, is evidence that there's no more hardship, that she has turned a corner. But the lack of problems that Mr. Lampkin is citing is simply her cutting off communication with the respondent. At a certain period of time, she had acted so poorly for such a long period of time that by October, November, she simply stopped talking to him. No responses to text messages, no communication during the visitation exchanges of the child. In fact, we have testimony in the record from Mr. Chapman saying, I got the door slammed in my face a few times. So to say that there was a lack of problems, no. It was just she cut off communication entirely, and that in itself is a problem for the custodial parent. You need to be able to communicate with the non-custodial parent. She cannot do that effectively. That is just evidence of further problems. And then finally, the Johnston v. Wheel case, that was cited by Mr. Lampkin in his brief and cited here today. That case involved a mental health evaluation that was ordered pursuant to, I think, 604. And that mental health evaluation, the court in Johnston v. Wheel said, there is no expectation that you are having a confidential communication between a physician or a doctor or a mental health professional. You were ordered by the court pursuant to 604 to undergo this treatment. So that case is not applicable to this situation, to this fact pattern. And we have an expectation of confidentiality, of not having what you have take place in settlement negotiations coming out before a court. And however the court wants to characterize it, demeanor, conduct, it's inadmissible. It will have a chilling effect on negotiations between the parties. You won't have negotiations between the parties anymore. You'll just have trials. Thank you. Okay, thanks to both of you. The case is submitted and the court will stand in recess until after lunch.